No. 83,714

DAVID PRAGER, III, *Plaintiff/Appellant,* v. STATE OF KANSAS, DEPARTMENT OF REVENUE; KARLA PIERCE, Secretary of the Kansas Department of Revenue, In Her Official Capacity; and JOHN D. LAFAVER, former Secretary of Kansas Department of Revenue, In His Personal Capacity, *Defendants/Appellees.*

(20 P.3d 39)

Opinion filed March 23, 2001.

*Alan V. Johnson*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, L.L.C., of Topeka, argued the cause, and *Louis F. Eisenbarth*, of the same firm, was with him on the briefs for appellant.

*Thomas V. Murray*, of Barber, Emerson, Springer, Zinn & Murray, L.C., of Lawrence, argued the cause, *Terence E. Leibold* and *Terrence J. Campbell*, of the same firm, were with him on the brief for appellees.

The opinion of the court was delivered by

LARSON, J.: Plaintiff appeals the trial court's dismissal for failure to state a claim on which relief can be granted of his suit seeking (1) declaratory and injunctive relief under 42 U.S.C. § 1983 (1994) for alleged violations of his rights of free speech and due process under the United States Constitution, (2) damages under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*, for (a) deprivation of his rights of free speech guaranteed by the Kansas and United States Constitutions, and (b) deprivation of his rights to due process guaranteed by the Kansas and United States Constitutions, (3) damages under the Kansas Civil Service Act (KCSA), K.S.A. 75-2925 *et seq.*, for deprivation of his rights to due process guaranteed by the Kansas and United States Constitutions, and (4) damages for retaliatory discharge based on a common-law claim of whistleblowing.

*Nature of the case*

The plaintiff and appellant in this case, David Prager, III, was employed by the Kansas Department of Revenue (Department) as an Attorney III, a classified civil service position, from 1988 until his employment was terminated in May 1997. During this period his primary duties involved representation of the Department in corporate tax appeals.

In the fall of 1996, Prager precipitated a controversy within the Department in response to public criticism of the Department's

actions by first delivering a memo to his supervisor and then sending a letter with a 12-page memo to Governor Bill Graves to defend his actions which had been criticized in the press. On January 8, 1997, Prager was suspended from his employment because his allegations and characterization of events compromised his ability to fairly represent the Department.

On February 6, 1997, Prager filed an appeal from his suspension with the Kansas Civil Service Board contending his suspension violated K.S.A. 75-2973, the Kansas "whistleblower" statute.

On March 17, 1997, Prager again sent a letter to Governor Graves in which he expressed concern about a possible illegal tax refund. On May 9, 1997, Prager's employment was proposed to be terminated for "lack of judgment, insubordination, violation of confidentiality . . . acting contrary to the interests of your client and exhibiting personal conduct detrimental to the state service. . . ." Prager was offered the opportunity to reply in writing, to appear, or to do both on the issue of his proposed dismissal. He failed to do either and his employment was terminated effective May 16, 1997.

On June 6, 1997, Prager filed an appeal with the Kansas Civil Service Board concerning his termination. His termination appeal was consolidated with his suspension appeal. We were informed by the parties that after a discovery dispute, the appeal has been heard and a ruling unfavorable to Prager on all issues raised has been appealed to and is now pending before the Shawnee County District Court.

The case before us was filed in January 1999 by Prager against the Kansas Department of Revenue; Karla Pierce, the then Secretary of Revenue in her official capacity; and John D. LaFaver, the former Secretary of Revenue in his personal capacity. The petition requests relief under the following five counts.

Count one prays for judgment under 42 U.S.C. § 1983 against the Kansas Department of Revenue and Secretary Pierce in her official capacity for (a) deprivation of Prager's federal constitutional rights of free speech and due process under color of State law and (b) reinstatement of Prager to his former position, and prays for

an award of attorney fees and litigation expenses pursuant to 42 U.S.C. § 1988 (1994).

Count two prays for judgment under the KTCA against the Kansas Department of Revenue and LaFaver in his personal capacity for deprivation of Prager's United States and Kansas constitutional rights of free speech and prays for damages in excess of $75,000.

Count three prays for judgment under the KTCA and the KCSA against the Kansas Department of Revenue and LaFaver in his personal capacity for deprivation of Prager's United States and Kansas constitutional rights of due process and prays for damages in excess of $75,000.

Count four contends the termination of Prager's employment was in retaliation for his "whistleblowing" in his letters to Governor Graves and prays for damages in excess of $75,000 under the KTCA against the Kansas Department of Revenue and LaFaver in his personal capacity.

Count five, which was dismissed by the trial court, requested damages for false light publicity. That dismissal was not appealed by Prager and is not an issue in this appeal.

The trial court's ruling that granted the defendants' motion to dismiss for failure to state a claim upon which relief can be granted will be described in more detail later in this opinion but essentially held: (1) Prager must exhaust his administrative remedies before the Kansas Civil Service Board prior to pursuing his claim under 42 U.S.C. § 1983, (2) as to counts two and three for violation of constitutional rights of free speech and due process, a common-law cause of action for violating a citizen's federal or state constitutional rights has not been recognized in Kansas and, therefore, the State and its agents are immune from liability, and (3) as to the claim for retaliatory discharge based on "whistleblowing" such claim is not viable because Prager disclosed confidential tax information in his communications to Governor Graves.

Prager appealed. Our jurisdiction is pursuant to K.S.A. 20-3018(c) (transfer on our motion).

*Factual statement*

Since no discovery had taken place when the motion to dismiss was filed, we must rely on the pleadings and exhibits attached

thereto as the facts we must consider. Both parties agree the holding of *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381 (10th Cir. 1997), was properly applied by the trial court and that the motion to dismiss was not converted into one for summary judgment.

The defendants attached to their motion to dismiss copies of Prager's letters to Governor Graves and Secretary LaFaver's letters of suspension and dismissal to Prager, all of which were referenced in Prager's petition, were considered by the trial court, and will be considered by us on appeal.

In ruling on the motion to dismiss, the trial court stated the following facts:

"1. Plaintiff . . . , held the position of Attorney III with the Department of Revenue from 1988 until his termination on May 16, 1997.

"2. On October 31, 1996, . . . Plaintiff delivered a memo to his supervisor, Richard Oxandale, general counsel for the Department of Revenue. At that time, Plaintiff was in charge of a corporate income tax appeal, hereinafter referred to as Tax Appeal A. In this memo, Plaintiff stated that the tax laws had been misinterpreted by Mr. Oxandale and the Secretary of the Department of Revenue, John D. LaFaver, in another tax appeal (hereinafter Tax Appeal B) which involved the same issue as Tax Appeal A, *i.e.* whether a federal agreement to extend the federal assessment limitation period extends the time period for a Kansas refund claim under K.S.A. 79-3230(e). He stated that little or no research had been done in arriving at this erroneous interpretation and that this erroneous interpretation resulted in an illegal tax refund of approximately $1.0 million to taxpayer B. Plaintiff's memo included three pages of legal analysis and included a request for a meeting with Mr. Oxandale and Secretary LaFaver. No meeting was ever scheduled.

"3. On December 18, 1996, Plaintiff Prager sent a letter and twelve-page memo to Governor Bill Graves. The letter provided in relevant part [bracketed portions were inserted by the trial court]:

'I am the senior state tax attorney who has been the subject of several personal attacks in the Topeka Capitol Journal. Although I have up to now endured this criticism without formal response, the December 8th editorial which said that my actions were an "outrage" causes me to step forward to personally explain to you what I know is the truth. Please consider and determine for yourself that La Siesta was not legally entitled to the pre-1995 credits and that the 1995 law should not have caused the abatement of La Siesta's pre-1995 liability. I am confident that when these articles and the issues they raise are examined . . ., the distortions and false accusations in them will become apparent.

'La Siesta was not legally entitled to tax credits that it claimed. While the construction of its facility commenced in June of 1982, the enterprise zone was not designated until October of 1982. Because the facility was established well before the enterprise zone designation, La Siesta did not qualify for the enhanced enterprise zone credits. . . . [The letter proceeds with a paragraph explaining the error in law applied to La Siesta's return.]

. . . .

'It is evident that S. Lucky DeFries misled you and your staff to the erroneous conclusion that La Siesta's assessment should be abated. Many of the statements in the La Siesta's article are false, and I assume that Mr. DeFries made the same and other misstatements to you. . . .

'There have been other false accusation[s] that I am unfair. . . . When the specific facts are examined for La Siesta, it should become clear to you that the criticism being leveled at me is totally unwarranted and that the abatement of La Siesta's assessment was in fact illegal. Although I certainly do believe in providing fair and courteous service to Kansas taxpayers, this does not include allowing a taxpayer to circumvent the law and it never will.

'As a lawyer for the State of Kansas, I believe it is my duty to represent the state to the best of my ability. If there is a problem resulting from the enforcement of the present law, the remedy should be change in the law rather than a direction to the Department's staff to bend the law or grant favors under the law.

'Because I have a great deal of respect for you as a thoughtful and fair person and I believe that the erroneous decision to abate the La Siesta assessment was caused by reliance upon the misrepresentations of Mr. DeFries, I am addressing these matters to you personally . . . .'

"The attached Memorandum to this letter provided in part:

'In November and December of 1996, I have been the object of several personal attacks in the Topeka Capital Journal. These attacks are unfair and untrue. I believe they have been orchestrated in large part by S. Lucky DeFries. . . .

[The next 11 paragraphs contain information on Plaintiff's employment with the Kansas Department of Revenue and his service on the MTC Litigation Committee.]

'Recent Background. After you took office, I believe some taxpayers thought that I would be forced to leave. . . . I have no doubt that you have received a lot of complaints about me, simply because the nature of my work is largely adversarial and because of the attraction of taxpayers pursuing political influence to circumvent the administrative hearing process. . . .

'Perhaps in a response to a memo from you, Richard Oxandale told me on October 14, 1996, that Secretary LaFaver wanted me to be relieved of responsibility for my tax appeals, which is most of what I do. The taxes at issue in my appeals are currently roughly $100 million. I met with LaFaver on Oc-

tober 16th. The attached memo [] dated November 4, 1996 describes these two meetings, which were rather odd. On November 4th we met again and I said to them that I would not permit this injustice to be done to me. We never did discuss any particular issues or complaints. This led me to believe that LaFaver was possibly going to attack me to deflect criticism against the Department. LaFaver and Oxandale both said throughout all these meetings that they thought my work performance was otherwise excellent.

[The memo then lists eight different newspaper articles and their publication date. The memo then blames DeFries' influence on the Governor as the reason for the eventual concession by Secretary LaFaver of the La Siesta credits issue. The memo then discusses in detail how each of the eight newspaper articles is untrue.]

'Where We Appear to Be Going. Anti-government and anti-tax attitudes, combined with Mr. DeFries' demagogic lobbying and false accusations appear to be inciting new legislation to irrationally punish the Department of Revenue and its employees. This irrational anger and the false accusations which serve to inflame them are a very poor basis for responsible legislative action.

[The memo then discusses three questions Plaintiff feels need to be asked in order to address Kansas' tax rates and then discusses three causes of taxpayer perceptions of unfairness which have been eliminated—foreign dividends, interest rate on tax underpayments at 18%, windfall profits taxes.]

'I know that a system of taxation based upon false accusation, intimidation, political influence and corruption is something you would like to avoid. I think we all need to take a time out to determine what is really happening here and to determine what action is and is not appropriate.'

"4. On December 30, 1996, Plaintiff delivered another memo to Mr. Oxandale, setting forth his analysis of a settlement offer made by the taxpayer in Tax Appeal A. He stated he did not believe Taxpayer A was legally entitled to a refund and that the settlement offer should be declined.

"5. On January 8, 1997, Secretary LaFaver sent a letter to Plaintiff stating in relevant part:

'I am in receipt of your unfortunate correspondence to the Governor regarding any array of tax issues at the Department of Revenue. In that correspondence you make a number of extremely serious allegations and characterization of events that seem to compromise your ability to fairly and judiciously represent the Kansas Department of Revenue as a tax attorney. I have counseled you that, while you are knowledgeable in corporate tax law, you have a problem acknowledging weaknesses of your cases. Your zeal to "win" can detract from a fair and sensible public policy outcome.

'Your letter illustrates better than any allegation I have heard you insensitivity to dealing with taxpayers in an unemotional and professional manner. You have imagined events that did not occur, and you have characterized actions of the Governor and me that I took with full legal advice as "illegal."

'That you chose to send such a letter to the Governor without discussing it with General Counsel or me reflects poorly upon your judgment and your willingness and ability to work as a member of this team. Clearly the letter required a thorough review of matters alluded to in the letter as well as other matters relating to the fairness and propriety of actions the department has taken in corporate tax litigation. This review must be and must appear to be professional and impartial. In order to assure the required impartiality, it will not be appropriate for you to continue your duties while this review is conducted.

'Accordingly, this letter is to inform you that you are suspended from employment, with pay. . . .

. . . .

'I sincerely regret having to take this action. However, your actions have left me no choice.'

"6. On February 6, 1997, Plaintiff filed an appeal with the Kansas Civil Service Board. He contended that his suspension was in violation of K.S.A. 1996 Supp. 75-2973, the Kansas 'whistleblower' statute. The hearing on Plaintiff's claim has not yet been held and is not scheduled to be held until September of 1999.

"7. On March 17, 1997, Plaintiff sent another letter to Governor Graves. In this letter, he expressed concerns about a possible illegal tax refund in Tax Appeal A. This letter stated in part:

'I am writing to inform you that in a currently pending corporate income tax administrative appeal ('Appeal A') it is apparent that Secretary LaFaver or Richard Oxandale, or both, intend to act so as to violate the law or violate their legal obligation to the State. The anticipated violation is likely to result in substantial injury to the State through the payment of an illegal refund, which could exceed $1.0 million in Appeal A.

. . . .

'In providing professional, legal representation in the course of my employment with the State of Kansas, the State of Kansas has always been and is my client. While Secretary LaFaver and Mr. Oxandale may have their own opinions regarding the La Siesta appeal, Appeal A and B or other tax appeal, it is my duty to differ with their opinions when they cause the tax laws to be violated.

'Please act to prevent Secretary LaFaver and Mr. Oxandale from causing an illegal refund to be issued in Appeal A.'

"8. On May 9, 1997, Secretary LaFaver sent Plaintiff an eleven-page letter. It stated in part:

'This is to advise you that I have made the decision to propose the termination of your employment as a staff attorney with the Kansas Department of Revenue. . . . It is my belief that your actions as an attorney with this department have evinced an overall lack of judgment, insubordination, violation of confidentiality in revealing private tax matters and matters concerning our former attorney-client relationship, acting contrary to the interests of your

client and exhibiting personal conduct detrimental to the state service which has caused undue disruption of the normal operation and proper functioning of this Department, all and each of which constitutes gross misconduct on your part, and conduct grossly unbecoming an attorney with this Department.

'The effective date of your proposed termination will be May 16, 1997.

. . . .

'You are offered the opportunity to reply in writing, or appear in person, or both, before me or my designee, on the issue of your proposed dismissal. If you wish to reply in writing, your correspondence must be received before May 16, 1997. If you wish to appear in person, you may appear in the Office of the Secretary at 1:30 p.m. on Thursday, May 15, 1997. You may represent yourself or be represented by a person of your choice. If you wish to appear in person you must notify the Director of Personnel at least one working day in advance of the hearing, in this case, Wednesday, May 14, 1997. If you wish to appear in person, represented by counsel, the Wednesday, May 14, 1997, notification must identify the name of the counsel or firm representing you.'

. . . .

"9. On June 6, 1997, Plaintiff filed an appeal with the Kansas Civil Service Board concerning his termination. His termination appeal has been consolidated with his suspension appeal and both are currently pending.

"10. On June 12, 1997, an article appeared in the Topeka Capital Journal regarding Plaintiff's termination from the Department. The article quoted several passages from Secretary LaFaver's termination letter.

. . . .

"12. Defendant Secretary Karla Pierce is current Secretary of the Department of Revenue."

Additional facts will be stated in our analysis as needed.

*Show cause order*

After oral argument, the court requested and both sides responded to our show cause order that raised the following additional questions:

"1. Why appellant's appeal as to his issue contending the right to recover for the claimed violation of his United States and Kansas constitutional right of free speech should not be dismissed in light of the inherent sovereign immunity of the State of Kansas. See *e.g., Alden v. Maine*, 527 U.S. 706, 144 L. Ed. 2d 636, 119 S. Ct. 2240 (1999); *Schall v. Wichita State University*, [269 Kan. 456, 7 P.3d 1144] ( 2000), and *Goldbarth v. Kansas State Board of Regents*, [269 Kan. 881, 9 P.3d 1251] (2000).

"2. (a) Why appellant's appeal as to his issue raising a common-law 'whistle-blowing' claim for relief should not be dismissed under the alternative remedies doctrine because K.S.A. 75-2973 provides a classified civil service employee an

adequate alternative remedy and thereby precludes the common-law remedy, or in the alternative,

(b) Why appellant's appeal as to his issue raising a common-law 'whistleblowing' claim for relief should not be dismissed for failure to exhaust his administrative remedies available and as established by K.S.A. 75-2973 and the Kansas Civil Service Act. See *e.g., Pecenka v. Alquest*, 232 Kan. 97, 652 P.2d 679 (1982)."

The parties' responses and the questions raised will be discussed as they relate to the issues raised by this appeal.

*Standard of review*

The manner in which motions to dismiss should be reviewed was recently set forth in *Ripley v. Tolbert*, 260 Kan. 491, Syl. ¶¶ 1, 2, 921 P.2d 1210 (1996), where we said:

"Disputed issues of fact cannot be resolved or determined on a motion to dismiss for failure of the petition to state a claim upon which relief can be granted. The question for determination is whether in the light most favorable to plaintiff, and with every doubt resolved in plaintiff's favor, the petition states any valid claim for relief. Dismissal is justified only when the allegations of the petition clearly demonstrate plaintiff does not have a claim.

"In considering a motion to dismiss for failure of the petition to state a claim for relief, a court must accept the plaintiff's description of that which occurred, along with any inferences reasonably to be drawn therefrom. However, this does not mean the court is required to accept conclusory allegations on the legal effects of events the plaintiff has set out if these allegations do not reasonably follow from the description of what happened, or if these allegations are contradicted by the description itself."

In *Noel v. Pizza Hut, Inc.*, 15 Kan. App. 2d 225, 230-233, 805 P.2d 1244, *rev. denied* 248 Kan. 996 (1991), which relied on *Bruggeman v. Schimke*, 239 Kan. 245, 247-48, 718 P.2d 635 (1986), the court applied the general rule for reviewing motions to dismiss for failure of a party to state a claim for relief:

"[I]t is our duty to determine whether those pleaded facts and inferences state a claim, not only on the theory which may be espoused by the plaintiffs, but on *any possible theory* we can divine.

"There are sound reasons for exercising judicial skepticism towards dismissal of a petition for failure to state a claim prior to the completion of discovery." 15 Kan. App. 2d at 231.

## IS PRAGER'S 42 U.S.C. § 1983 CLAIM SEEKING ONLY DE-CLARATORY AND INJUNCTIVE RELIEF SUBJECT TO DIS-MISSAL?

*Exhaustion of administrative remedies*

We first consider the trial court's ruling dismissing Prager's § 1983 claim because he was seeking identical relief before the Kansas Civil Service Board and because that available remedy was deemed to be adequate and must be exhausted before a state court action could be commenced. There is considerable merit in such a holding as we have uniformly held that the KCSA provides a complete procedure for administrative review in cases where a state employee complains of a wrongful dismissal; in such case, the dismissed employee is ordinarily required to exhaust available administrative remedies before bringing an independent action to challenge his dismissal. See *Pecenka v. Alquest*, 232 Kan. 97, Syl. ¶ 4, 652 P.2d 679 (1982). Unfortunately, this issue is not disposed of so easily because there is a substantial body of case law, much of it before the United States Supreme Court, that relates to this precise issue where relief is requested based on the provisions of 42 U.S.C. § 1983.

Before dealing directly with the precise arguments of the parties on the question of exhaustion of administrative remedies, we briefly turn to the provisions of 42 U.S.C. § 1983, which provides in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

As was stated in *Swinehart v. City of Ottawa*, 24 Kan. App. 2d 272, 275, 943 P.2d 942 (1997), "42 U.S.C. § 1983 is not itself a source of substantive rights, but rather a method for vindicating federal rights elsewhere conferred. [Citations omitted.]" A § 1983 claim has two essential elements: (1) whether the conduct complained of was committed by a person acting under color of state

law, and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981), *overruled in part on other grounds Daniels v. Williams*, 474 U.S. 327, 330-31, 88 L. Ed. 2d 662, 106 S. Ct. 662 (1986). Both state and federal courts are proper forums for such actions. *Gumbhir v. Kansas State Board of Pharmacy*, 231 Kan. 507, 509, 646 P.2d 1078 (1982), *cert. denied* 459 U.S. 1103 (1983).

States are not "persons" within the meaning of § 1983, and neither are state officials sued in their official capacity for money damages or other retroactive relief. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989); *Americare Properties, Inc. v. Whiteman*, 257 Kan. 30, 51-52, 891 P.2d 336 (1995).

The holding in *Will* that neither a State nor its officials acting in their official capacity are "persons" under § 1983 referenced footnote 10, which states:

> "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' *Kentucky v. Graham*, 473 U.S., at 167, n. 14; *Ex parte Young*, 209 U.S. 123, 159-160 (1908). This distinction is 'commonplace in sovereign immunity doctrine,' L. Tribe, American Constitutional Law § 3-27, p. 190, n. 3 (2d ed. 1988), and would not have been foreign to the 19th-century Congress that enacted § 1983, see, *e.g., In re Ayers*, 123 U.S. 443, 506-507 (1887); *United States v. Lee*, 106 U.S. 196, 219-222 (1882); *Board of Liquidation v. McComb*, 92 U.S. 531, 541 (1876); *Osborn v. Bank of United States*, 9 Wheat. 738 (1824)." 491 U.S. at 71 n.10.

The reinstatement claimed by Prager is contended to be the precise kind of injunctive relief that may be sought against a state official in his or her official capacity. See *Doe v. Wigginton*, 21 F.3d 733, 738 (6th Cir. 1994); *LaFleur v. Wallace State Community College*, 955 F. Supp. 1406, 1423 (D.C. Ala. 1996); *Illinois Health Care Ass'n v. Suter*, 726 F. Supp. 191 (N.D. Ill. 1989); 1 Nahmod, Civil Rights and Civil Liberties Litigation—The Law of Section 1983, § 6.69, p. 6-205 (4th ed. 2000) (discussing *Will* and "persons").

With the right of Prager to request injunctive relief established (which does not necessarily require that such relief should be granted), we turn to the trial court's statement in dismissing Prager's § 1983 claim for lack of exhaustion of administrative remedies:

"Although the United States Supreme Court in *Patsy v. Florida Board of Regents*, [457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982),] held that exhaustion of administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983, the Court disagrees and holds that in state court, Plaintiff is required to exhaust his administrative remedies when those remedies are adequate before bringing a separate federal cause of action."

The trial court also quoted at length a portion of *Pet v. Department of Health Services*, 207 Conn. 346, 368-70, 542 A. 2d 672 (1988), in which the Connecticut Supreme Court stated that it did not interpret *Patsy* as having abrogated the requirement of inadequacy of an available legal remedy as a prerequisite to obtaining injunctive relief in state court.

Prager relies on the decision in *Patsy v. Florida Board of Regents*, 457 U.S. 496, 73 L. Ed. 2d 172, 102 S. Ct. 2557 (1982), and the subsequent holdings in *Felder v. Casey*, 487 U.S. 131, 101 L. Ed. 2d 123, 108 S. Ct. 2302 (1988), and *Howlett v. Rose*, 496 U.S. 356, 110 L. Ed. 2d 332, 110 S. Ct. 2430 (1990), in contending the trial court's ruling on the exhaustion finding must be reversed. We consider these three cases in more detail.

In *Patsy*, the plaintiff sued under § 1983 in federal court for declaratory and injunctive relief or, in the alternative, damages, alleging discriminatory employment practices by a state university. Her case was dismissed because she failed to exhaust available state administrative remedies. The United States Supreme Court held that a judicially imposed exhaustion requirement would be inconsistent with the congressional intent of § 1983 and that any exhaustion requirement should be left to Congress; it reaffirmed a long line of cases in holding that exhaustion of state administrative remedies is not a prerequisite to an action under § 1983. 457 U.S. at 500-01, 516. Justice White in a concurring opinion stated: "For nearly 20 years and on at least 10 occasions, this Court has clearly held that no exhaustion of administrative remedies is required in a § 1983 suit. [Citation omitted.] Whether or not this initially was

a wise choice, these decisions are *stare decisis.*" 457 U.S. at 517. Justice O'Connor's concurring opinion in which Justice Rehnquist joined stated: "[T]his Court already has ruled that, in the absence of additional congressional legislation, exhaustion of administrative remedies is not required in § 1983 actions." 457 U.S. at 517. Only Justice Powell with Justice Rehnquist joining would have required exhaustion if the question was properly before the court. 457 U.S. at 532.

The *Patsy* decision did not settle the exhaustion question because the § 1983 suit had been brought in federal court. Thereafter, lower courts split on whether the same no-exhaustion rule would apply in actions brought in state court. This issue, along with others came before the United States Supreme Court in *Felder.*

At issue in *Felder* was a Wisconsin notice-of-claim statute which required state court plaintiffs to notify governmental defendants against whom they had a claim of the circumstances leading to the claim and the intent to hold the defendant liable. Claimants also had to refrain from filing suit for 120 days after such notice or else face dismissal of their actions. The United States Supreme Court developed several reasons for concluding that the notice-of-claim statute could not be applied to litigants bringing § 1983 suits in state court. Three of the themes in *Felder* relevant to this appeal were its anti-exhaustion sentiment; its consideration of whether a particular state rule was a neutral, uniformly applicable rule of procedure; and its consideration of whether the state rule was outcome-determinative. 487 U.S. at 153.

The Court acknowledged that state courts may establish the rules of procedure governing litigation in their own courts, but emphasized that where state courts entertain a federal cause of action, the federal right cannot be defeated by the forms of local practice. The Court found that enforcement of the notice statute in § 1983 actions in state court would "frequently and predictably" produce different outcomes in federal civil rights litigation based solely on whether that litigation takes place in state or federal court (an apparent reference to the fact that if one failed to comply with the notice statute, it would lead to dismissal in state court but not in federal court) and stated: "States may not apply such an out-

come-determinative law when entertaining substantive federal rights in their courts." 487 U.S. at 141.

The Court found that the notice statute frustrated the goal of § 1983 to provide compensatory relief to those deprived of federal rights by state actors, in part because it was not "a neutral and uniformly applicable rule of procedure" but instead was "a substantive burden imposed only upon those who seek redress for injuries resulting from the use or misuse of governmental authority." The Court also noted that while the victim of an intentional tort had 2 years to recognize the compensable nature of his or her injury, the notice-of-claim statute gave civil rights victims only 4 months to appreciate that he or she has been deprived of a federal constitutional or statutory right. Finally, the Court found the statute objectionable because it "operates, in part, as an exhaustion requirement, in that it forces claimants to seek satisfaction in the first instance from the governmental defendant." 487 U.S. at 141-42.

With regard to the exhaustion aspect of the rule, the Court stated:

"Finally, the notice provision imposes an exhaustion requirement on persons who choose to assert their federal right in state courts, inasmuch as the § 1983 plaintiff must provide the requisite notice of injury within 120 days of the civil rights violation, then wait an additional 120 days while the governmental defendant investigates the claim and attempts to settle it. In *Patsy v. Board of Regents of Florida*, 457 U.S. 496 (1982), we held that plaintiffs need not exhaust state administrative remedies before instituting § 1983 suits in federal court. The Wisconsin Supreme Court, however, deemed that decision inapplicable to this state-court suit on the theory that States retain the authority to prescribe the rules and procedures governing suits in their courts. 139 Wis.2d, at 623. . . . As we have just explained, however, that authority does not extend so far as to permit States to place conditions on the vindication of a federal right. Moreover, as we noted in *Patsy*, Congress enacted § 1983 in response to the widespread deprivations of civil rights in the Southern States and the inability or unwillingness of authorities in those States to protect those rights or punish wrongdoers. *Patsy*, [457 U.S.] at 503-505; [citation omitted]. . . . [Congress] conferred concurrent jurisdiction on state courts as well. 457 U.S. at 506-07. Given the evil at which the federal civil rights legislation was aimed, there is simply no reason to suppose that Congress meant 'to provide these individuals immediate access to the federal courts notwithstanding any provision of state law to the contrary,' [citation omitted] yet contemplated that those who sought to vindicate their federal rights in state courts

could be required to seek redress in the first instance from the very state officials whose hostility to those rights precipitated their injuries." 487 U.S. at 146-47.

The Court also rejected the argument that any exhaustion requirement imposed by the notice-of-claim statute was de minimus and did not alter a claimant's right to seek full compensation through suit. The Court responded that

" 'the dominant characteristic of civil rights actions [is] they belong in court. [Citation omitted.] These causes of action . . . exist independent of any other legal or administrative relief that may be available as a matter of federal or state law. They are judicially enforceable in the first instance.' [Citation omitted.] The dominant characteristic of a § 1983 action . . . does not vary depending upon whether it is litigated in state or federal court . . . ." 487 U.S. at 148.

Neither the reasonableness of the administrative waiting period nor the interests it was designed to serve could overcome these essential principles. 487 U.S. at 148. The Court noted its refusal in *Patsy* "to engraft an exhaustion requirement" onto § 1983 actions where Congress failed to do so, in part, because judicial imposition of such a requirement would be "inconsistent with Congress' recognition that § 1983 plaintiffs normally need not exhaust administrative remedies." 487 U.S. at 149. "Finally," the Court stated, "to the extent the exhaustion requirement is designed to sift out 'specious claims' from the stream of complaints that can inundate local governments in the absence of immunity, [citation omitted], we have rejected such a policy as inconsistent with the aims of the federal legislation." 487 U.S. at 149.

*Patsy* and *Felder* together establish a broad no-exhaustion rule for § 1983 actions whether brought in state or federal court. See IB Schwartz & Kirklin, Section 1983 Litigation: Claims and Defenses, § 10.3, p. 564-65 (3d ed. 1997); Steinglass, *Litigating Section 1983 Actions in State Court*, pp. 73-74 (West rev. ed. 1999). There are exceptions for certain prisoner cases and state taxation cases, but neither exception applies here. See Steinglass, at 74-75 and 102-07.

The significance of the *Howlett* decision from Prager's argument is that it discusses and applies the requirement that under the United States Constitution

"[t]he Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source. 'The suggestion that the act of Congress is not in harmony with the policy of the State, and therefore that the courts of the State are free to decline jurisdiction, is quite inadmissible because it presupposes what in legal contemplation does not exist. When Congress, in the exertion of the power confided to it by the Constitution, adopted that act, it spoke for all the people and all the States, and thereby established a policy for all. That policy is as much the policy of [the State] as if the act had emanated from its own legislature, and should be respected accordingly in the courts of the State.' [Citations omitted.]" 496 U.S. at 371.

There is no merit to the Department's argument that the *Patsy-Felder* no-exhaustion rule applies only to cases where damages are requested. *Felder* was a damage case, but *Patsy* involved a claim for declaratory and injunctive relief or, in the alternative, damages. Moreover, several of the cases on which *Patsy* relied for the proposition that exhaustion of state administrative remedies is not required in § 1983 actions, see 457 U.S. at 500-01, involved claims *only* for declaratory and injunctive relief. See, *e.g.*, *Gibson v. Berryhill*, 411 U.S. 564, 36 L. Ed. 2d 488, 93 S. Ct. 1689 (1973); *Carter v. Stanton*, 405 U.S. 669, 31 L. Ed. 2d 569, 92 S. Ct. 1232 (1972); *King v. Smith*, 392 U.S. 309, 20 L. Ed. 2d 1118, 88 S. Ct. 2128 (1968).

We recognize the Department's additional contention that under *Junction City Education Ass'n v. U.S.D. No. 475*, 264 Kan. 212, 223-24, 955 P.2d 1266 (1998), declaratory relief is generally inappropriate where administrative remedies have not been exhausted, but that case is in no way comparable to our case as it involved the Professional Negotiations Act, K.S.A. 72-5413 *et seq.*

We are not prepared to rely on either *Pet*, 207 Conn. 346, or the case it relied on, *Laurel Park, Inc. v. Pac*, 194 Conn. 677, 690, 485 A.2d 1272 (1984), which gave lip service to relying on Patsy.

Defendants draw on *Felder* language to argue the requirement of exhausting remedies prior to seeking injunctive relief is a neutral, uniformly applicable rule of procedure that is not outcome determinative and may therefore be applied even in a § 1983 case. They rely on language in *Howlett* as well as similar language in *Johnson v. Fankell*, 520 U.S. 911, 138 L. Ed. 2d 108, 117 S. Ct. 1800 (1997).

The Court in *Howlett* acknowledged that "States . . . have great latitude to establish the structure and jurisdiction of their own courts [citations omitted]" and "may apply their own neutral procedural rules to federal claims, unless those rules are preempted by federal law." 496 U.S. at 372. However, in referring to *Felder*, the Court said: "In *Felder v. Casey*, we followed *Martinez* [*v. California*, 444 U.S. 277, 62 L. Ed. 2d 481, 100 S. Ct. 553 (1980),] and held that a Wisconsin notice-of-claim statute that effectively shortened the statute of limitations and imposed an exhaustion requirement on claims against public agencies and employees was pre-empted insofar as it was applied to § 1983 actions." 496 U.S. at 377. *Howlett* does not substantiate the defendant's argument.

In *Johnson*, it was held that defendants in state court § 1983 actions do not have a federal right to an interlocutory appeal from a denial of qualified immunity, but the court found the petitioners' reliance on *Felder's* "outcome determinative" test was misplaced because the term "outcome," as used in *Felder*, referred to the ultimate disposition of the case, and the postponement of the appeal until after final judgment would not affect the ultimate outcome of the case if petitioners' qualified immunity claim was meritorious. 520 U.S. at 920-21.

*Johnson* does not substantiate the trial court's ruling as it was already in court and involved only a question of the right to an immediate appeal and not a choice between agency action and court action. In contrast, the issue in this case is whether Prager must first seek injunctive relief through administrative channels before seeking it from the court. The Supreme Court has already stated that where § 1983 is concerned, the vindication of rights protected by that statute belongs in court in the first instance.

The defendants also rely on *Smith v. State*, 264 Kan. 348, 955 P.2d 1293 (1998), where eight plaintiffs sought to challenge the pretrial release procedures being used in the Third Judicial District pursuant to that district's court rules. *Smith* is simply not applicable, it did not involve exhaustion, did not discuss *Patsy* or *Felder*, and provides no persuasive authority to uphold the trial court's decision herein.

It is apparent from the reading of the concurring and dissenting opinions in *Patsy* that an earlier, more strict view of the desirability of exhaustion might have led us to a different result, but that time is past and, as stated in *Felder*, the dominant characteristic of a § 1983 civil rights action is that they belong in court independent of any other legal or administrative relief that may be available under state or federal law. We reverse the trial court's decision dismissing Prager's § 1983 claims for failure to exhaust administrative remedies.

*Sovereign immunity of the State of Kansas*

We asked in the order to show cause for the parties to respond to the following question:

"Why appellant's appeal as to his issue contending the right to recover for the claimed violation of his United States and Kansas constitutional right of free speech should not be dismissed in light of the inherent sovereign immunity of the State of Kansas. See *e.g.*, *Alden v. Maine*, 527 U.S. 706, 144 L. Ed. 2d 636, 119 S. Ct. 2240 (1999); *Schall v. Wichita State University*, [269 Kan. 456, 7 P.3d 1144] (2000), and *Goldbarth v. Kansas State Board of Regents*, [269 Kan. 881, 9 P.3d 1251] (2000)."

The replies we received were predictable in their application of the above cases which were not argued to or considered by the trial court.

The Department contends the State enjoys sovereign immunity from Prager's claims for damages for constitutional violations of his rights of free speech and due process under counts two and three of his petition. According to the Department, qualified immunity is deemed to exist unless (1) the State waives it, or (2) it is abrogated by Congress pursuant to a valid exercise of its power to do so, relying on *Alden v. Maine.* The Department then restates the argument that when the State of Kansas enacted the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.*, it limited the circumstances where sovereign immunity was waived by the provisions of K.S.A. 75-6103(a), which states:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment *under circumstances*

*where the governmental entity, if a private person, would be liable under the laws of this state."* (Emphasis added.)

The Department contends that Kansas has not waived its sovereign immunity to claims under the United States or Kansas Constitutions, see *Goldbarth v. Kansas State Board of Regents,* 269 Kan. 881, 9 P.3d 1251 (2000), and because of the wording of K.S.A. 75-6103(a) of the KTCA that a governmental entity can be liable only if a private person would be liable (which they are not as to constitutional torts), sovereign immunity exists.

The Department then argues that because the KTCA does not support claims against LaFaver, the constitutional free speech and due process claims against him should be dismissed. This is because the KTCA authorizes claims against Kansas governmental "entities" and not against governmental officers or agents.

The Department next argues that the 42 U.S.C. § 1983 claims should be dismissed against it pursuant to sovereign immunity because such claims may only be made against "persons" and it is not a "person." *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 105 L. Ed. 2d 45, 109 S. Ct. 2304 (1989).

As to the official capacity claim against Pierce, sovereign immunity is claimed by the Department to require dismissal. However, the Department recognized that the *Ex Parte Young,* 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), legal fiction of allowing official capacity suits for declaratory relief can trump sovereign immunity under certain circumstances (although this case is not one of those circumstances). The Department recognized that in *Alden v. Maine,* it was stated that the *Ex Parte Young* fiction is merely a doctrine of necessity where the majority stated:

"[T]he exception to our sovereign immunity doctrine recognized in *Ex Parte Young* . . . is based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers *must therefore be permitted if the Constitution is to remain the supreme law of the land."* 526 U.S. at 747.

However, Secretary Pierce strongly contends there is no "necessity" here where the State has enacted a complex remedial mechanism for civil service employees who claim to have been

subjected to retaliation because of protected speech, citing K.S.A. 75-2973. This conclusion followed Secretary Pierce's argument that the *Ex Parte Young* fiction need not be applied because of the holdings in cases such as *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74-76, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996) (Congress had prescribed a complex remedial scheme for vindication of rights), and *Idaho v. Cour d' Alene Tribe of Idaho*, 521 U.S. 261, 274, 138 L. Ed. 2d 438, 117 S. Ct. 2028 (1997) (Idaho courts open to resolve dispute between the Tribe and the State).

Secretary Pierce strongly contends that where Prager has utilized the State's remedial mechanism by appealing his suspension and termination to the Kansas Civil Service Board and then to the Shawnee County District Court under the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* the *Ex Parte Young* fiction should not be involved because our Kansas courts are open to his claims and the inherent sovereign immunity of the State of Kansas requires dismissal of the attempted 42 U.S. § 1983 claim.

Prager argues in his response to our show cause order that sovereign immunity of the State of Kansas does not bar his free speech claim under § 1983 or under the KTCA. He recognizes that *Alden v. Maine* holds that the State's immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution and which they retain today but points out that immunity is not unlimited and does not bar all judicial review of State compliance with the Constitution or valid federal law.

Prager then points to *Schall v. Wichita State University*, 269 Kan. 456, 7 P.3d 1144 (2000), as recognizing that sovereign immunity is subject to certain limitations when we held:

"Courts have set forth three ways that state immunity may be relinquished: (1) where the state has consented to suit; (2) where the application of *Ex parte Young*, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), and its progeny is appropriate; or (3) where Congress has abrogated the state's immunity." 269 Kan. 456, Syl. ¶ 4.

Prager then argues that the first two limitations set forth in *Schall* apply here—the State of Kansas has consented to suit on his free

speech claim under the KTCA and *Ex Parte Young* applies to his free speech claim under § 1983.

Prager develops his argument that the *Alden v. Maine* recognition of *Ex Parte Young* and its progeny as restricting the limitation to sovereign immunity applies to his § 1983 claim through the following *Alden* quote:

"Some suits against state officers are barred by the rule that sovereign immunity *is not limited* to suits which name the State as a party if the suits are, in fact, against the State. [Citations omitted.] The rule, however, does not bar certain actions against state officers for injunctive or declaratory relief. Compare *Ex Parte Young*, 209 U.S. 123[, 52 L. Ed. 714, 28 S. Ct. 441] (1908), and *In re Ayres*, [123 U.S. 443, 31 L. Ed. 216, 8 S. Ct. 164 (1887)], with [Idaho v.] *Cour d'Alene Tribe of Idaho*, [521 U.S. 261, 138 L. Ed. 2d 438, 117 S. Ct. 2028 (1997)], *Seminole Tribe [of Fla. v. Florida*, 517 U.S. 44, 116 S. Ct. 1114, 134 L. Ed. 2d 252, (1996)], and *Edelman v. Jordan*, 415 U.S. 651[, 39 L. Ed. 2d 662, 94 S. Ct. 1347] (1974)." 527 U.S. at 756-57.

While *Will v. Michigan Dept. of State Police* is principally relied on as authority to prohibit damage actions against States or its officials under § 1983, the often quoted footnote 10 of 491 U.S. at 71 is utilized by Prager to show authority earlier than *Alden*, and states:

"Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.' *Kentucky v. Graham* [473 U.S. 159, 167 n. 14 (1985)]; *Ex Parte Young*, 209 U.S. 123, 159-60 (1908). This distinctive is 'commonplace in sovereign immunity doctrine.' L. Tribe American Constitution Law § 3-27, p. 190 n.3 (2d ed. 1988), and would not have been foreign to the 19th century Congress that enacted § 1983 [citations omitted]."

In attempting to show that Kansas decisions both before and after *Alden* recognized this immunity limitation, Prager cites for support *Americare Properties, Inc., v. Whiteman*, 257 Kan. 30, Syl. ¶ 10, 891 P.2d 336 (1995), and *Goldbarth*, 269 Kan. at 887, where we stated:

"In addition, § 1983 is a remedy available to address the misconduct of *persons* acting under color of state law. See *Hafer v. Melo*, 502 U.S. 21, 27, 116 L. Ed. 2d 301, 112 S. Ct. 358 (1991). Goldbarth's § 1983 claims against WSU and the Regents also fail. WSU and the Regents are state agencies. See K.S.A. 74-3201 *et seq.* (the Regents); K.S.A. 76-3a01 *et seq.* (WSU); K.S.A. 76-711(a); K.S.A. 76-

712. A state agency is not a 'person' under § 1983. See *Will*, 491 U.S. at 64; *Beck v. Kansas Adult Authority*, 241 Kan. 13, Syl. ¶ 1, 735 P.2d 222 (1987). The only exception involves situations where the plaintiff is seeking prospective relief. *Will*, 491 U.S. at 71, n.10 (quoting *Kentucky v. Graham* 473 U.S. 159, 167, n.14, 87 L. Ed. 2d 114, 105 S. Ct. 3099 [1985]). Goldbarth's petition asserted a claim for injunctive relief. He was granted a temporary restraining order. However, the district court dissolved the restraining order and Goldbarth has not appealed the dissolution. The exception is not applicable here."

Prager contrasts his situation to the *Goldbarth* facts, for here he *has* appealed the dismissal of his free speech claim under § 1983 and his claim is asserted against a state official in her official capacity.

Prager, earlier in his response, summarized *Ex Parte Young* as holding there was federal court jurisdiction over a suit to enjoin a state officer from official actions which violate federal law even if the State itself is immune from suit under the Eleventh Amendment. This is because a state official may not enforce state legislation which is void where it is unconstitutional. The officer is stripped of his or her official or representative character and therefore, "[t]he State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." 209 U.S. at 159-60.

The final authority Prager cites on this issue is claimed to justify the injunctive relief he sought: reinstatement to his former position as an Attorney III employee. Prager claims the relief he sought is similar to that asked for in *Power v. Summers*, 226 F.3d 815 (7th Cir. 2000), where Circuit Judge Posner said:

"An injunction that is a simple order to pay is not within *Ex Parte Young's* dispensation for injunctions to restrain unconstitutional conduct. *Edelman v. Jordan*, 415 U.S. 651, 666-69, [39 L. Ed. 2d 662, 94 S. Ct. 1347] (1974); *Mercer v. Magnant*, 40 F.3d 893, 898-99 (7th Cir. 1994), as that would set the Eleventh Amendment to naught by a verbal trick. But an injunction that, as in *Graham v. Richardson*, 403 U.S. 365, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971), forbids an improper classification by the state is proper even if it has definite financial implications. *Edelman v. Jordan, supra*, 415 U.S. at 667, . . .; *Continental Insurance Co. v. Illinois Department of Transportation*, 709 F.2d 471 (7th Cir.1983). And so *an injunction that orders a state employee who has been demoted because of his exercise of a federally protected right to be restored to his previous position is not barred by the Eleventh Amendment even though it imposes a salary obligation*

on the state. *E.g., Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986); *Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1985). That is a permissible characterization of what the plaintiffs are seeking here." (Emphasis added.)

Prager summarizes his contention that his free speech claim under § 1983 is not barred by the State of Kansas' sovereign immunity because it is asserted only against a state official in her official capacity and he seeks only prospective relief and not monetary damages.

As to his count two claim for damages in alleged violation of his free speech right under the KTCA, Prager argues this falls under the consent exclusion to sovereign immunity recognized in *Alden v. Maine.* He argues that because we had judicially abolished the principle of sovereign immunity, only the legislative principle of sovereign immunity exists today as codified by the KTCA.

Prager reasons that the State of Kansas is to be treated the same as other units of government under the KTCA. He contends that because we previously recognized a retaliatory discharge action based on exercise of freedom of speech in *Larson v. Ruskowitz*, 252 Kan. 963, 850 P.2d 253 (1993), against a county, and the KTCA treats the State the same as other units of government, the State has therefore consented to the suit based on a free speech claim under the KTCA.

The preceding summaries of the parties' response to the first question of our show cause order requires us to return to the question of whether the trial court was correct in dismissing the 42 U.S.C. § 1983 action, if not for failure to exhaust remedies, then for other valid reasons.

We first consider whether the Kansas Department of Revenue was properly dismissed from the 42 U.S.C. § 1983 action and hold that it was. In *Will v. Michigan Dept. of State Police,* the United States Supreme Court clearly held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." 491 U.S. at 71. While the *Will* opinion did in the often-cited footnote 10 state that a state official in his or her official capacity when sued for injunctive relief would be a person under

§ 1983, it did not make this applicable to the State itself or any of its agencies (such as the Department of Revenue in this case).

The authority relied on in *Will,* 491 U.S. 71, footnote 10 is *Kentucky v. Graham,* 473 U.S. at 167 n.14, which states:

"Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, however, a State cannot be sued directly in its own name regardless of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 57 L. Ed. 2d 1114, 98 S. Ct. 3057 (1978) (per curiam)."

The State of Kansas has clearly not waived its Eleventh Amendment immunity nor has Congress overridden it under the facts of this case.

With Prager relying on *Will* as the authority to justify his claim for injunctive relief against Secretary Pierce, sued in her official capacity, as a "person," he must also bear the burden of the same authority as prohibiting his § 1983 claim against the Department.

Such a ruling is consistent with our holding in *Goldbarth* where we said: "Goldbarth's § 1983 clams against WSU and the Regents also fail. WSU and the Regents are state agencies. [Citations omitted]. A state agency is not a 'person' under § 1983. See *Will,* 491 U.S. at 64; *Beck v. Kansas Adult Authority,* 241 Kan. 13, Syl. ¶ 1, 735 P.2d 222 (1987)." 269 Kan. at 887.

Accordingly, the Department is not, as a matter of law, a "person" under § 1983 and Prager has failed in count one to state a claim against it upon which relief can be granted. The result reached by the trial court in dismissing the Department from count one of Prager's petition was correct, even though it may have relied upon the wrong ground. See *Bank of Kansas v. Davison,* 253 Kan. 780, 792, 861 P.2d 806 (1993).

The remaining question is whether the § 1983 claim for injunctive relief only (reinstatement of employment) against Secretary Pierce in her official capacity was correctly dismissed, if not for failure to exhaust administrative remedies, then for other valid reasons. This is a far more difficult question to answer.

We have previously set forth summaries of the well-reasoned responses to our show cause order as to this question which we need not now repeat. We are, however, reminded of our standard

of review that we first set forth plus additional language of *Noel v. Pizza Hut, Inc.*, that, "under our modern procedure, the petition does not intend and is not necessarily intended to govern the entire course of the lawsuit" and that "dismissal of a petition for failure to state a claim prior to the utilization of discovery procedures is seldom warranted." 15 Kan. App. 2d at 232-33.

We begin our discussion with summaries of the three recent cases referenced in our show cause order in our attempt to determine if an absolute bar has been placed on the § 1983 relief Prager requests because of the remedies available to him under his Civil Service Appeal and K.S.A. 75-2973 or whether the right to claim *Ex Parte Young* and its progeny relief may be pled for acts which are contended to require relief.

The background to and holding of *Alden v. Maine* as it related to claims under the Family Medical Leave Act (FMLA) and the Americans with Disabilities Act (ADA) was thoroughly discussed by Justice Abbott speaking for our unanimous court in *Schall v. Wichita State University*. The FMLA and ADA issues dealt with the question of whether Congress had abrogated States' immunity as it has the right to do, but in giving background and explaining the decision of *Alden v. Maine*, we said in part:

"The United State Supreme Court in *Alden v. Maine*, 527 U.S. 706, 144 L. Ed. 2d 636, 119 S. Ct. 2240 (1999), however, recently allowed the State of Maine to assert immunity even though the action was brought in state court. In *Alden*, the plaintiffs, a group of probation officers, filed suit against the State of Maine, alleging that the State had violated the overtime provisions of the Fair Labor Standards Act (FLSA). . . .

"The suit was dismissed in state district court on the basis of sovereign immunity, which the Maine Supreme Judicial Court affirmed. . . .

"The United States Supreme Court, writing through Justice Kennedy, noted that although the Eleventh Amendment provides immunity to the states when an action is brought in federal court, the immunity is not derived from the language of the Amendment but that the Amendment is a realization of a state's sovereignty that existed prior to the ratification of the Constitution. 527 U.S. at 713. . . .

. . . .

"The *Alden* Court noted that in previous cases, such as *Hilton* and *Will*, it had suggested that the Eleventh Amendment did not apply in state courts because of the language of the Amendment, but distinguished those cases by stating that 'the

bare text of the Amendment is not an exhaustive description of the States' constitutional immunity from suit.' 527 U.S. at 736.

"In concluding, the *Alden* Court stated:

" 'In light of the language of the Constitution and the historical context, it is quite apparent why neither the ratification debates nor the language of the Eleventh Amendment addressed the States' immunity from suit in their own courts. The concerns voiced at the ratifying conventions, the furor raised by *Chisholm*, and the speed and unanimity with which the Amendment was adopted, moreover, underscore the jealous care with which the founding generation sought to preserve the sovereign immunity of the States. To read this history as permitting the inference that the Constitution stripped the States of immunity in their own courts and allowed Congress to subject them to suit there would turn on its head the concern of the founding generation—that Article III might be used to circumvent state-court immunity. In light of the historical record it is difficult to conceive that the Constitution would have been adopted if it had been understood to strip the States of immunity from suit in their own courts and cede to the Federal Government a power to subject nonconsenting States to private suits in these fora.' 527 U.S. at 743.

. . . .

"Kansas has sovereign immunity from claims by individuals based on federal law even when they are brought in state court." 269 Kan. at 463-66.

The *Schall* opinion goes on to state:

"Courts have set forth three ways that state immunity may be relinquished: (1) where the state has consented to suit; (2) where the application of *Ex parte Young*, 209 U.S. 123, 52 L. Ed. 714, 28 S. Ct. 441 (1908), and its progeny is appropriate; or (3) where Congress has abrogated the state's immunity. *Nelson v. Miller*, 170 F.3d 641, 646 (6th Cir. 1999). Kansas has not consented to be sued on either the ADA or FMLA claims in this matter and *Ex parte Young* is not applicable." 269 Kan. at 466.

The *Schall* opinion then focused on whether Congress had abrogated the State's immunity. This is not applicable to our case and did not relate to the State's consent or application of *Ex Parte Young* and its progeny, which are both claimed by Prager.

The *Goldbarth* decision which we have previously quoted in approving the dismissal of the Department of Revenue from the § 1983 claims of count one of Prager's opinion also involved a claim where prospective relief has been granted in the form of a temporary restraining order but, as the opinion stated: "However, the district court dissolved the restraining order and Goldbarth has not appealed the dissolution. The exception is not applicable here."

269 Kan. at 887. As Prager points out he *has* appealed the dismissal of his request for injunctive relief so the *Goldbarth* decision did not require the analysis we must make here.

Prager relies on the "prospective injunctive relief" distinctions described in *Ex Parte Young, Will, Alden,* and our decision in *Americare Properties,* 257 Kan. 30, and *Goldbarth,* 269 Kan. 881. Prager asserts his § 1983 suit against Pierce seeks only injunctive relief and is not barred by sovereign immunity.

The clear identification of those circumstances where injunctive and declaratory relief being sought from state officials will avoid sovereign immunity barriers is not easy. As the United States Supreme Court said in *Edelman v. Jordan,* 415 U.S. 651, 667, 39 L. Ed. 2d 662, 94 S. Ct. 1347, *reh. denied* 416 U.S. 1000 (1974), "[a]s in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex Parte Young,* will not in many instances be that between day and night."

The *Edelman* decision clearly sets forth the ruling that a private party seeking damages is prohibited by the Eleventh Amendment if the State has not consented to the suit which limits the application of *Ex Parte Young* only to prospective relief. In describing *Ex Parte Young,* the *Edelman* opinion stated:

"*Ex Parte Young* was a watershed case in which this Court held that the Eleventh Amendment did not bar an action in the federal courts seeking to enjoin the Attorney General of Minnesota from enforcing a statute claimed to violate the Fourteenth Amendment of the United States Constitution. This holding has permitted the Civil War Amendments to the Constitution to serve as a sword, rather than merely as a shield, for those whom they were designed to protect." 415 U.S. at 664.

The question which we must ultimately answer is whether the upswell of Eleventh Amendment immunity decisions has announced a new era where even the injunctive claims authorized by *Will* and recognized to remain in existence by our *Goldbarth* and *Schall* decisions will nevertheless be prohibited. Such an action is no longer "necessary" to protect the rights of Kansas residents who have remedies for claimed unconstitutional actions under Civil Ser-

vice Board appeals (K.S.A. 75-2949) or protection from alleged whistleblowing retaliation (K.S.A. 75-2973).

We are convinced, based on Prager's response to our show cause order, that the limited request for injunctive relief in count one of his petition raises a valid question of whether he is entitled to injunctive relief (if his underlying contentions of constitutional violations can be ultimately shown, a question we do not here answer), unless the Kansas statutory schemes under which he is contemporaneously exercising his administrative remedies are deemed legally sufficient to protect the rights recognized under *Ex Parte Young* and its progeny.

We recognize that, as Secretary Pierce has argued, the United States Supreme Court has not previously specifically held that "state courts must entertain § 1983 suits," *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 587, n.4, 132 L. Ed. 2d 509, 115 S. Ct. 2351 (1995). But, having previously opened our courts to such actions and their possible prophylactic effect, we are hesitant to close our courts to our citizens attempting to exercise claimed constitutional rights.

Secretary Pierce argues convincingly that although *Seminole Tribe of Fla. v. Florida*, was not a § 1983 case, the *Ex Parte Young* fiction was not deemed proper. There, because Congress had enacted a complex remedial scheme (the Indian Gaming Regulatory Act), when the Tribe sued Florida and its Governor, both claims were barred by the Eleventh Amendment. The continued validity of the *Ex Parte Young* exception to sovereign immunity was recognized but not applied. The Court explained: "[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex Parte Young*." 517 U.S. at 74.

The remedial scheme and attendant concerns in *Seminole Tribe* were unique and it is difficult to draw a direct correlation between what the Gaming Act established and the constitutional rights attempted to be enforced by Prager's injunctive claim. We can see the Kansas Civil Service Act's remedies as an "alternative" remedial scheme to be used in place of § 1983, but such a result seems

contrary to the expressed sentiments of *Felder*, 487 U.S 131, (albeit in a different context) that § 1983 cases belong in court and they exist independent of any other legal or administrative relief available under state or federal law. 487 U.S. at 148.

We are also hesitant to justify a dismissal based on Secretary Pierce's reliance on *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261, where the State of Idaho, several of its agencies, and numerous state officials in official and individual capacities were sued. The Supreme Court noted that Idaho was willing to face the suit in its own courts and stated: "In this case, there is neither warrant nor necessity to adopt the *Young* device to prove an adequate judicial forum for resolving the dispute between the Tribe and the State. Idaho's courts are open to hear the case, and the State neither has nor claims immunity from their process or their binding judgment." 521 U.S. at 274. This was essentially a quiet title action and seems distinguishable from the case we face since Idaho's courts were open to hear the controversy and here, the State is raising the shield of sovereign immunity in order to avoid Prager's free speech and due process § 1983 injunctive claims.

While the answer we give to this issue may change as the progeny of *Alden v. Maine* develops, at this point our desire to allow § 1983 cases to be in court and the restrictive and limited standard of review we have previously addressed, suggests that dismissal should not be ordered without the right of discovery and development of this claim.

The kind of reinstatement based on declaratory relief has prior to *Alden v. Maine* been permitted by other courts in official capacity actions. See *LaFleur v. Wallace State Community College*, 955 F. Supp. 1406, 1423 (D.C. Ala. 1996).

The availability of reinstatement under an injunctive prayer seems to remain alive after *Alden v. Maine*, as *Power v. Summers*, 226 F.3d 815 (7th Cir. 2000), teaches. The plaintiffs in *Power* were university professors who brought suit under § 1983 against a public university president, other officials, and the trustees alleging retaliation for exercise of First Amendment free speech. Plaintiffs sought damages as well as an injunctive order that the university raise their base salary to what it would have been had they not

been discriminated against on account of their exercise of free speech. The president was sued in both his official and individual capacity and the trustees in their official capacity only. The *Power* opinion stated at one point that a suit against a state official in his or her official capacity is a suit against the State and, therefore, is barred by the Eleventh Amendment unless immunity is waived. However, the *Power* court, speaking through Judge Posner, went on to state:

"Left are the individual-capacity claims against the university's president and other officials, and also the possibility that the plaintiffs, if they succeed in proving retaliation, can obtain injunctive relief against the university, since official-capacity suits against state officials that seek only injunctive relief are permitted by 42 U.S.C. § 1983, *Will v. Michigan*, . . . supra, 491 U.S. at 71 n. 10, . . . and not forbidden by the Eleventh Amendment. *Ex Parte Young*, 209 U.S. 123 . . . (1908); *Bethesda Lutheran Homes & Services, Inc. v. Leean*, 122 F.3d 443, 444 (7th Cir. 1997)." 226 F.3d at 819.

Later in the opinion, the *Power* court noted that an injunction that forbids an improper classification by the State is proper even if it has definite financial implications:

"And so an injunction that orders a state employee who has been demoted because of his exercise of a federally protected right to be restored to his previous position is not barred by the Eleventh Amendment even though it imposes a salary obligation on the state. *E.g.*, *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986); *Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995); *Dwyer v. Regan*, 777 F.2d 825, 836 (2d Cir. 1985)." 226 F.3d at 820.

The *Power* court expressly recognized (1) that official capacity suits against state officials that seek only injunctive relief are permitted under § 1983 and are not forbidden by the Eleventh Amendment, and (2) that an order to restore an employee to his or her previous position is a kind of injunctive relief *not* barred by the Eleventh Amendment. Because the exceptions applicable to Eleventh Amendment sovereign immunity should also be generally applicable in the state court, sovereign immunity is incorporated by reference into the general sovereign immunity context (see *Alden*, where the usual Eleventh Amendment exceptions to sovereign immunity are applicable in state courts). We hold that sovereign immunity does not bar Prager's § 1983 claims for only declaratory

and injunctive relief against Secretary Pierce in her official capacity.

This does not prevent Secretary Pierce from seeking summary judgment, once all the facts and contentions are fully developed, nor should our ruling be interpreted as holding that the minimal facts alleged show constitutional violations.

## DID THE TRIAL COURT ERR IN DISMISSING PRAGER'S FIRST AMENDMENT CLAIM BROUGHT PURSUANT TO THE KANSAS TORT CLAIMS ACT?

Count two of Prager's petition seeks damages under the KTCA against the Kansas Department of Revenue and LaFaver personally by asserting his suspension and subsequent termination of his employment willfully and wantonly deprived him of his rights of free speech under the United States and Kansas Constitutions.

The trial court considered count two along with Prager's count three claim for damages based on violation of state and federal due process rights and sustained the motion to dismiss for the same reasons as to both counts.

The defendants contended that because the KTCA provided that a governmental entity would be liable only if a private person would be liable and there was no statutory or common-law cause of action by which a private person could be found liable for deprivation of Prager's constitutional rights, then neither the Department nor LaFaver could be held liable for violation of Prager's constitutional rights.

The trial court recognized that Prager claimed *Kennedy v. Board of Shawnee County Comm'rs*, 264 Kan. 776, 958 P.2d 637 (1998), *Kansas Dept. of SRS v. Goertzen*, 245 Kan. 767, 783 P.2d 1300 (1989), and *Wertz v. Southern Cloud Unified School District*, 218 Kan. 25, 542 P.2d 339 (1975), recognized a cause of action for violation of constitutional rights of due process and *Larson v. Ruskowitz*, 252 Kan. 963, 850 P.2d 253 (1993), supported a cause of action for violation of the constitutional right of free speech.

The trial court distinguished the four cases by stating that none held that a private person could be held liable for a constitutional

tort and, therefore, neither could a governmental entity or its employees be held liable under the KTCA for a constitutional tort.

The trial court relied on *FDIC v. Meyer*, 510 U.S. 471, 477-78, 127 L. Ed. 2d 308, 114 S. Ct. 996 (1994), where it was held that to be an actionable claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (1994), which contained language substantially similar to K.S.A. 75-6103(a), the claim must allege that the United States would be liable to the claimant as a private person. Likewise, the KTCA provided only for liability where the governmental entity, if a private person, would be liable under the laws of this state. Because there is no statutory or common-law cause of action in Kansas by which a private person may be liable for damages for deprivation of a person's constitutional rights, neither the Department nor LaFaver could be liable for Prager's claims under the KTCA.

In addition to considering the grounds relied upon by the trial court in granting the defendant's motion to dismiss, we must also consider if Prager's claim was also required to be dismissed because of the State's inherent sovereign immunity in light of *Alden, Schall,* and *Goldbarth,* as we asked in our show cause order. The contentions of the parties set forth in their responses to our order have been previously referred to herein and need not be repeated, although they are directly applicable to the result we reach.

We hold the trial court correctly dismissed Prager's First Amendment claims under the KTCA because of sovereign immunity and also for the reasons relied upon in its memorandum decision to which we previously referred. The basic premise to both reasons is whether the Kansas Legislature, when it enacted the KTCA, created a cause of action for a constitutional tort or specifically waived its immunity when such a cause of action is claimed. We hold that it did neither.

The First Amendment of the United States Constitution applies to the states through the Fourteenth Amendment and prohibits the government from " 'abridging the freedom of speech, or of the press.' " *State v. Barclay*, 238 Kan. 148, 151, 708 P.2d 972 (1985). Section 11 of the Kansas Constitution Bill of Rights provides: "The liberty of the press shall be inviolate; and all persons may freely

speak, write or publish their sentiments on all subjects, being responsible for the abuse of such rights . . . ."

The Kansas Department of Revenue enjoys sovereign immunity because Kansas has not waived its immunity, nor has Congress abrogated such immunity pursuant to a valid exercise of power. *Alden*, 527 U.S. 706; *Schall*, 269 Kan. at 466, *Goldbarth*, 269 Kan. at 893-94. This is not a new pronouncement, as we held in *Siple v. City of Topeka*, 235 Kan. 167, 169-70, 679 P.2d 190 (1984), that the State of Kansas is exempt from privately instituted suits for damages, absent its consent, as follows:

"Subject to the limitations of this act, each governmental entity shall be liable for damages caused by the negligent or wrongful act or omission of any of its employees while acting within the scope of their employment under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." K.S.A. 75-6103(a).

The KTCA creates no new cause of action beyond what is already available under Kansas law, and there can be no greater liability under the KTCA than a private person would have under Kansas law. K.S.A. 75-6103; McAllister & Robinson, *The Potential Civil Liability of Law Enforcement Officers and Agencies*, 67 J.K.B.A. 14, 16 (Sept. 1998).

We recognized in *Goldbarth* that Kansas has not waived its sovereign immunity to constitutional claims when we held: "WSU and the Regents are entitled to assert sovereign immunity as a defense to plaintiff's First Amendment free speech claim." 269 Kan. 881, Syl. ¶ 2(4). However, there was no allegation in *Goldbarth* that the State had consented to be sued. *Alden* concluded that the sovereign's rights to assert immunity from suit in its own courts was a principle so well established that no one conceived it would be altered by the new Constitution. 527 U.S. at 741.

Kansas has not waived its sovereign immunity under K.S.A. 75-6103(a) as it states that "each governmental entity shall be liable . . . if a private person would be liable." A private person is not liable for a constitutional tort and, therefore, the Kansas Department of Revenue and its employees are not liable and retain immunity.

Nor did Congress abrogate Kansas' sovereign immunity because as we said in *Schall* in order to do so Congress must "unequivocally express its intent to abrogate the immunity." 269 Kan. at 466.

There is no federal statute authorizing direct claims under the United States or Kansas Constitutions against the State. Any attempt by the Congress to do so as to a state constitution would be patently unconstitutional. *Cf. Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 106, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984).

Thus, Prager's First Amendment claim fails because of sovereign immunity, but it also does so because we distinguish the three cases he claims show that Kansas recognizes a common-law claim for violation of a citizen's constitutional right of freedom of speech against the State. *Larson v. Ruskowitz*, 252 Kan. 963; *Dennis v. Ruskowitz*, 19 Kan. App. 2d 515, 873 P.2d 199, *rev. denied* 255 Kan. 515 (1994); *Riddle v. City of Ottawa*, 12 Kan. App. 2d 714, 754 P.2d 465, *rev. denied* 243 Kan. 780 (1988).

*Riddle* involved a § 1983 action against a city and one of its officials for allegedly violating a city public safety officer's Fourteenth Amendment due process rights and his First Amendment free speech rights. In analyzing Riddle's free speech claim, 12 Kan. App. 2d at 719-20, the *Riddle* court relied on three key cases: *Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983), which involved a § 1983 claim; *Perry v. Sindermann*, 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), which was a separate civil suit involving a claim for reinstatement and money damages, but which did not state the basis for the plaintiff's authority for the suit; and *Pickering v. Board of Education*, 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968), which was an administrative appeal and did not involve a claim for money damages. None of these cases are authority for First Amendment action for damages directly under the Constitution.

Prager mainly relies on *Larson* where the plaintiffs alleged their employment was terminated by Wyandotte County Community Corrections for criticizing the operations of the agency's director. The parties characterized the action as being a whistleblower retaliatory claim under the KTCA and, on appeal, we stated the nec-

essary elements of retaliatory discharge based on alleged violation of public employees' First Amendment rights. 252 Kan. at 974-75.

The *Larson* defendants never argued that a First Amendment claim was not cognizable under the language of K.S.A. 75-6103(a) of the KTCA because the plaintiffs claims were never viewed as being First Amendment claims until this court issued its opinion. Neither the plaintiffs nor the defendants would have any reason to dispute the viability of a whistleblowing action under the KTCA because such actions can arise against both public and private employers. We never expressly considered whether a First Amendment claim was ·cognizable under the language of K.S.A. 75-6103(a) of the KTCA, and, instead, focused on the elements of First Amendment claims as described in *Riddle*. However, *Riddle* was a § 1983 case. Because the *Larson* opinion did not consider the viability of the First Amendment claim under the language of K.S.A. 75-6103(a) of the KTCA, *Larson* should not be taken as authority on that point.

*Dennis*, 19 Kan. App. 2d 515, is no more useful. *Dennis* never mentioned § 1983 or the KTCA; Dennis' authority for her suit was not an issue in the case. *Dennis* simply followed the approach taken in *Larson* without considering whether a First Amendment claim would be permitted under the language of K.S.A. 75-6103(a).

The cases cited by Prager do not show recognition of a First Amendment KTCA claim against the State or any waiver of immunity on behalf of the State that has been recognized by our courts.

The language of K.S.A. 75-6103(a) is plain that the government could only be liable under the KTCA "under circumstances where the governmental entity, if a private person, would be liable under the laws of this state." Under this language, a governmental entity bears no greater liability than would a private person or entity operating in the private sector, and a plaintiff seeking recovery under the KTCA must raise a recognized tort action. See Note, *Governmental Liability: A Review of Judicial Decisions Applying the Kansas Tort Claims Act*, 24 Washburn L. J. 499, 503 n.36 (1985).

Prager has failed to cite any Kansas case permitting a private person or entity to be found liable for money damages for inter-

fering with someone's right of free speech under either the United States or Kansas Constitutions. In those cases where the issue has arisen, Kansas has so far rejected *Bivens*-type actions (*i.e.*, actions based on the principles stated in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 29 L. Ed. 2d 619, 91 S. Ct. 1999 [1971], for damages based directly under the Constitution without implementing legislation). See *Goldbarth v. Kansas State Board of Regents*, 269 Kan. 881, 9 P.3d 1251 (2000) (free speech claim for money damages); *Gross v. Capital Electric Line Builders, Inc.*, 253 Kan. 798, 807-08, 861 P.2d 1326 (1993); *Sharp v. State*, 245 Kan. 749, 754, 783 P.2d 343 (1989), *cert. denied* 498 U.S. 822 (1990) (noting that the United States Supreme Court has limited judicial expansion of *Bivens*-type actions).

The language of the Kansas Constitution may be worded more broadly than the United States Constitution, but we have treated both provisions as "generally considered coextensive." See *State v. Russell*, 227 Kan. 897, 899, 610 P.2d 1122 (1980), *cert. denied* 449 U.S. 983 (1980). In *Boyer v. Board of County Comr's of Johnson County*, 922 F. Supp. 476, 483 n.5 (D. Kan. 1996), *aff'd* 108 F.3d 1388 (D. Kan. 1997), the court refused to permit a claim for money damages under the KTCA for violation of free speech rights under the Kansas Constitution because a constitutional tort could not have been brought against a private person; the court rejected Boyer's argument that the free speech language of the Kansas Constitution would permit her action because of its broader language.

For all the reasons above stated, we hold the trial court correctly dismissed Prager's attempted claim of count two for violation of his claimed constitutional rights of free speech.

## DID THE TRIAL COURT ERR IN DISMISSING PRAGER'S DUE PROCESS CLAIMS UNDER EITHER THE KANSAS TORT CLAIMS ACT OR THE KANSAS CIVIL SERVICE ACT?

In count three of his petition, Prager essentially makes two claims for relief. He prayed for damages under the KTCA for deprivation of his constitutional rights of due process under the Fourteenth Amendment to the United States Constitution and § 18 of the Kansas Constitution Bill of Rights based upon the suspension

and termination of his employment and also because of the delay in his hearing before the Kansas Civil Service Board.

While he asserted in the trial court the deprivation of his liberty interest in his "good name, reputation, honor and integrity" and "false and stigmatizing" statements in the course of his termination of employment plus property interest in his classified civil service employment, his liberty interest/reputation claim does not appear to have been briefed on appeal and is deemed abandoned. See *Pope v. Ransdell*, 251 Kan. 112, 119, 833 P.2d 965 (1992).

As we have previously stated in detail, the trial court considered the free speech claim in count two along with the due process claim of count three and dismissed both because it found no cases where a private person could be liable for a constitutional tort, and without private person liability, there cannot be governmental entity or employee liability under the KTCA. What we said as to the free speech claim need not be repeated. How it applies to Prager's claim here is a different matter, for he claims Kansas recognizes a common-law claim for violation of a citizen's constitutional rights of due process.

On appeal, Prager first claims that as a public employee he has a property interest in continued employment protected by the constitutional guaranty of due process, citing *Kennedy v. Board of Shawnee County Comm'rs*, 264 Kan. at 797. He then concedes that he was afforded a minimal pretermination hearing pursuant to K.S.A. 75-2949(b) which is constitutionally adequate as long as it is followed by a prompt post-termination hearing.

When Prager's appellant's brief was filed on November 17, 1999, he had not received his hearing before the Kansas Civil Service Board. He did not contend the hearing would itself be constitutionally inadequate. He did contend that because he had a property interest in salary and benefits and the post-termination hearing had then been delayed 28 months, he was entitled to payment pending the hearing.

Prager then contended that two cases, *Wertz v. Southern Cloud Unified School District*, 218 Kan. 25, 29, 542 P.2d 339 (1975) (a nontenured school teacher whose employment was terminated in mid-year was deemed entitled to back pay from discharge until a

due process hearing was afforded), and *Kansas Dept. of SRS v. Goertzen*, 245 Kan. 767, 783 P.2d 1300 (1989) (*Goertzen II* claim to allow damages for failure to provide a due process hearing at the time of demotion), recognized his claim. He additionally argued that *Goertzen II* rejected a claim of SRS immunity where we stated:

"By enacting the Kansas Civil Service Act, the Kansas Legislature expressly imposed by law a duty upon the state to treat its citizens fairly and equally in regard to public service. Thus, the state was not immune from suit for irregularities under the Kansas Civil Service Act, which resulted in a violation of Goertzen's right to due process of law." 245 Kan. at 780-81.

The defendants agreed that *Wertz* and *Goertzen II* did hold that where a public employee employment was terminated without the opportunity for a pretermination hearing, back pay is due until a post-termination hearing is conducted. But, the defendants then argued, Prager has conceded that he *was* afforded the opportunity of having a pretermination hearing that was constitutionally adequate and, therefore, *Wertz* and *Goertzen II* do not apply and do not grant Prager any rights under the facts of our case.

The defendants further contended that Prager waived any constitutional rights of due process by informing LaFaver that he would not appear at the pretermination hearing. As to Prager's claim that *Wertz* and *Goertzen II* supported his common-law "constitutional tort" theory, the defendants pointed out that *Goertzen II* involved an appeal of a Civil Service Board decision and was not based on a separate constitutional tort cause of action. *Wertz* was distinguished as being decided before the full array of procedures now existing on the discharge of a public employee came into existence. Furthermore, the defendants argued that under the specific holding of *Schmeck v. City of Shawnee*, 231 Kan. 588, 594, 647 P.2d 1263 (1982), due process rights under the Kansas Constitution do not create a cause of action.

Finally, the defendants argued that neither *Wertz* nor *Goertzen II* support the proposition that an individual such as LaFaver could be liable for damages for alleged violation of another person's due process rights because the KTCA only allows suits against governmental agencies under circumstances where the entity, "if a private

person, would be liable." K.S.A. 75-6103(a). If there is no support for a claim against LaFaver personally, the defendants contended, there is likewise no valid claim against the Kansas Department of Revenue.

Prager's reply brief countered by citing *Gilbert v. Homar*, 520 U.S. 924, 138 L. Ed. 2d 120, 117 S. Ct. 1807 (1997), and *FDIC v. Mallen*, 486 U.S. 230, 100 L. Ed. 2d 265, 108 S. Ct. 1780 (1988), that held a post-termination hearing must be sufficiently prompt in order to satisfy the constitutional requirement of due process. Prager therefore claimed that because *Mallen* said "the significance of such a delay cannot be evaluated in a vacuum," 486 U.S. at 242, a disputed issue of fact remained as to whether his post-termination hearing before the Kansas Civil Service Board scheduled for March 6, 2000, would have been a sufficiently *prompt* hearing.

The constitutional provisions in issue here are well known. The Fourteenth Amendment provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." Section 18 of the Kansas Constitution Bill of Rights states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The protection afforded by the Fourteenth Amendment is protection against state action rather than private action. For such due process to apply, there must be state action and deprivation of an individual interest of sufficient substance to warrant constitutional protection. *Wertz*, 218 Kan. at 29. Section 18 does not create any new rights of action; it merely requires the Kansas courts to be open and afford a remedy for such rights as are recognized by law. *Schmeck v. City of Shawnee*, 231 Kan. at 594.

Prager is correct in noting that as a permanent classified employee under the KCSA, he had rights under the KCSA to continued employment in the absence of a legitimate cause for termination. *Wright v. Kansas Water Office*, 255 Kan. 990, Syl. ¶ 1, 881 P.2d 567 (1994). In contending he has a property interest in continued employment protected by due process, he relies on *Wertz* and *Goertzen II*.

*Wertz* did not involve either the KCSA or the KTCA. Wertz was a nontenured school teacher who had been fired in mid-year by the school board without a hearing. When this happened in 1972, Kansas did not have a statutory procedure for a hearing of a public school teacher, and we noted that under K.S.A. 72-5411, the continuing contract law in effect required a finding that Wertz had a property interest in his contract and should have been given a hearing prior to his termination without pay. Wertz was entitled to back pay from the date of discharge until a due process hearing was afforded or until the contract for that current year had expired. While there are due process principles here, *Wertz* was decided prior to the KTCA, did not involve the KSCA, and is really a contract law case peculiar to a public school teacher. It does not justify the relief Prager asks for.

*Goertzen II* was a sequel to *Goertzen v. State Department of Social & Rehabilitation Services*, 218 Kan. 313, 543 P.2d 996 (1975) (*Goertzen I*), and must be considered in light of its extreme factual situation. In *Goertzen I*, a civil service employee of the SRS with permanent status appealed the Civil Service Board's ruling that he had no right to an appeal hearing on the reasonableness of his dismissal and prior demotion with loss of pay. We held in *Goertzen I* that, as a civil service employee with permanent status, Goertzen's interest in continued employment was protected by procedural due process and he was entitled to a hearing before the Board on the issue of his demotion. The case was remanded to the district court with orders to remand the proceeding to the civil service board for a hearing on the reasonableness of Goertzen's demotion and "other appropriate action." 218 Kan. at 321. Due to several procedural delays, some of which may have been attributable to SRS's efforts to avoid a hearing, the Board did not hold the required due process hearing until November 1986, 15 years after Goertzen's August 1971 demotion and roughly 5 years after Goertzen's death in 1981. 245 Kan. at 768-69. The Board awarded Goertzen's estate token damages.

On review, the district court held the Board's award was contrary to the law and evidence. SRS appealed. This court held in *Goertzen II* that Goertzen had been entitled to a hearing before being de-

moted and that he was entitled to damages in the form of back wages for the failure to provide the hearing. Back wages were to be awarded from the date of demotion until a due process hearing was given or until reinstatement ceased to be possible, which for Goertzen was the date of his death. 245 Kan. at 779-80.

Of importance to Prager's contentions here is *Goertzen II's* discussion of the State's immunity. The KTCA was not an issue as it was not in effect at the time of *Goertzen I,* but SRS argued it was entitled to immunity under K.S.A. 46-901 (Weeks), which was in effect from 1970 until July 1, 1979, when the KTCA took effect. We rejected SRS's claim of immunity stating:

"The Kansas Legislature specifically provided for government liability here. The Kansas Civil Service Act was enacted in 1941 . . . .

"By creating a civil service law that granted permanent status to a state employee, the Kansas Legislature gave the employee an interest in continued employment that the state cannot infringe arbitrarily. Thus, as this court noted in the earlier *Goertzen* appeal:

'One of the purposes of the civil service laws is to take from the appointing officer the right of arbitrary removal of an employee. This privilege not to be subjected to arbitrary removal should extend as well to demotion, especially where loss of pay is involved and indeed our statutes do so recognize this right.' 218 Kan. at 320.

. . . .

"By enacting the Kansas Civil Service Act, the Kansas Legislature expressly imposed by law a duty upon the state to treat its citizens fairly and equally in regard to public service. Thus, the state was not immune from suit for irregularities under the Kansas Civil Service Act, which resulted in a violation of Goertzen's right to due process of law." 245 Kan. at 780-81.

In essence, as the KCSA has been interpreted as creating a right for continued employment and an implied cause of action against a state employer who terminates an employee without due process, it necessarily seems to include a concomitant waiver of sovereign immunity for such damages. See *Wright,* 255 Kan. at 997-99 (liability under the KSCA is a liability "created by statute").

Because rights of due process do not apply in the absence of state action, a private person cannot ordinarily be liable for firing an employee without due process. Prager cites to no Kansas case or statute which recognizes such liability against a purely private actor in these circumstances and has not raised or developed an

argument for the extension of Kansas law in this area. Because the KTCA permits monetary liability only in "circumstances where the governmental entity, if a private person, would be liable," the KTCA is not applicable to Prager's due process claim. It is apparent that the trial court correctly dismissed Prager's KTCA due process claim and its ruling doing so must be affirmed.

However, in Prager's petition, brief, and reply brief, he makes the alternative argument that his due process damages claim is viable by virtue of the KCSA. *Goertzen II* appears to support such a cause of action. Whether Prager's circumstances are sufficient to justify such a claim remains to be considered.

The liability recognized by *Goertzen II*, however, is "governmental liability," see 245 Kan. at 780, not liability against the individual agents. Therefore, the claim against LaFaver in his individual capacity on this count of the petition was properly dismissed.

The defendants correctly contend that Prager was offered and elected to waive the right to attend a pretermination hearing. Therefore, the holdings of *Wertz* and *Goertzen II* in that regard have no applicability here. The only question which remains is whether a procedural due process cause of action could be based on a claimed undue delay between the time of termination and the post-termination hearing under the KCSA.

K.S.A. 75-2949 provides pre- and post-termination procedures for classified civil service employees. After the opportunity for a pretermination hearing, an employee can, within 30 days of the effective date of the employment action, request a post-termination hearing by an appeal to the Civil Service Board. Upon a proper request for a hearing, the Board shall grant a hearing in accordance with the procedures of the Kansas Administrative Procedure Act, K.S.A. 77-501 *et seq.* (KAPA), within 45 days of the request. K.S.A. 75-2949(f).

The record is not developed as to when the hearing before the Civil Service Board was actually held, but we were informed at the time of oral argument (September 12, 2000) that the hearing had been held, an order entered, and an appeal therefrom was pending. We also know from the briefs that discovery issues existed which were contested by the parties, but we do not know the nature or

extent thereof. We do know the 45-day limitation of K.S.A. 75-2949(f) was not met in this case, but we have no basis to sustain a motion to dismiss a claim of delay of the post-termination hearing at this time. The defendants have focused on the fact Prager was afforded the opportunity of a prompt pretermination hearing, and that contention is clearly correct, but they have not focused on the claimed due process violation relating to the timing of the post-termination hearing. The reasons for the delay and timing thereof need to be developed by the trial court. Prager's claim for a due process constitutional violation under the KCSA is not subject to dismissal based on the record before us at this time. We express no opinion as to the issue nor does our ruling mean Prager is entitled to relief or that the Department will not be entitled to dismissal or summary judgment. The facts and law on this claim are yet to be determined.

## DID THE TRIAL COURT ERR IN DISMISSING PRAGER'S WHISTLEBLOWER RETALIATORY DISCHARGE CLAIM?

Count four of Prager's petition asked for damages under the KTCA against the Kansas Department of Revenue and LaFaver in his personal capacity for whistleblowing retaliatory discharge. He claimed the two letters sent to Governor Graves "blew the whistle" on an illegal tax abatement and an illegal tax refund. He claimed he acted in a good faith concern over the violation of tax laws and that his actions were a motivating factor in LaFaver's decisions to suspend and then terminate his employment.

The defendants stated in their motion to dismiss that Prager's whistleblowing claim must fail because Prager assuredly (1) did not make allegations of illegal conduct; (2) acted out of improper motive; (3) disclosed information regarding taxpayers made confidential under K.S.A. 79-3234 such that LaFaver had authority to fire him under K.S.A. 75-2973(c)(4)(C); and (4) breached his professional duties of loyalty and confidentiality to his employer-client.

Although Prager's claim appears to be based on what he calls a "common-law whistleblower" cause of action, he did reference in his factual statement in his petition that he was pursuing his rights

under the Kansas "whistleblower" statute, K.S.A. 1996 Supp. 75-2973, in his appeal with the Kansas Civil Service Board.

The trial court, despite no mention that this claim was being made under K.S.A. 75-2973, utilized the "confidential information caveat" of the whistleblower statute in granting the motion to dismiss when it stated:

"The Court concludes that Plaintiff has not stated a valid claim for whistle-blowing because K.S.A. 75-2973 . . . does not 'prohibit disciplinary action of an employee who discloses information which: . . . (C) is confidential or privileged under statute or court rule.' Here, Plaintiff disclosed confidential tax information he was privy to due to his position in the Department. Thus, the Court finds that Plaintiff cannot state a valid claim under whistle-blowing because K.S.A. 75-2973 specifically allows disciplinary action to be taken against Plaintiff."

Prager argues in response to the dismissal that it was error to apply a provision of the statutory act as the basis for dismissing his "common-law" whistleblowing/retaliatory discharge claim. We agree. We do not, however, agree with Prager's argument that Kansas Civil Service classified employees can pursue both statutory and common-law whistleblowing claims for the reasons that follow.

K.S.A. 75-2973, which is now known as the Kansas Whistleblower Act, was enacted in 1984, and the provisions in effect during the facts giving rise to this case provided in applicable part:

"(b) No supervisor or appointing authority of any state agency shall:
(1) Prohibit any employee of the agency from reporting any violation of state or federal law or rules and regulations to any person, agency or organization; or
(2) require any such employee to give notice to the supervisor or appointing authority prior to making any such report.
"(c) This section shall not be construed as:
. . . .
(4) prohibiting disciplinary action of an employee who discloses information which: (C) is confidential under any other provision of law.
"(d) Any officer or employee who is in the classified civil service and has permanent status under the Kansas civil service act may appeal to the state civil service board whenever the officer or employee alleges that the disciplinary action was taken against the officer or employee in violation of this act or in any court of law or administrative hearing. . . . If the board finds that disciplinary action taken was unreasonable, the board shall modify or reverse the agency's action and order such relief for the employee as the board considers appropriate."

The provisions of K.S.A. 75-2973 have been referred to in only two reported Kansas cases. The first is *Palmer v. Brown*, 242 Kan. 893, Syl. ¶¶ 1-3, 752 P.2d 685 (1988), where this court declared it to be public policy of the State to encourage citizens to report infractions of the law pertaining to public health, safety, and the general welfare, and held that "[t]ermination of an employee in retaliation for the good faith reporting of a serious infraction of the law by a co-worker or an employer to either company management or law enforcement officials is an actionable tort."

The Palmer case involved a private employer, but in our analysis determining whether an actionable tort should be recognized, our opinion noted that state employees received protection against wrongful discharge because State action is involved and that K.S.A. 75-2973(b) (now [c]) specifically protects Kansas employees' rights to report violations of law to any person or agency. 242 Kan. 896.

The other Kansas case, *Crandon v. State*, 257 Kan. 727, 897 P.2d 92 (1995), *cert. denied* 506 U.S. 1113 (1996), did involve a state employee. The former general counsel for the office of the State Banking Commission brought an action against the State Banking Commission and the State Bank Commissioner after she was discharged for reporting possible violations of federal and state law to the Federal Deposit Insurance Corporation. Crandon "alleged a common-law whistle-blowing retaliatory discharge claim, a claim for violation of K.S.A. 1994 Supp. 75-2973, and a 42 U.S.C. § 1983 (1988) claim for violation of her First Amendment right of free speech." 257 Kan. at 728. The trial court granted the defendants' motion for summary judgment. Crandon appealed and this court affirmed. On appeal, we determined that Crandon could not prevail on her statutory whistleblower claim because, applying the higher standard applicable to agency attorneys, especially chief counsel, she had made the disclosure with reckless disregard for the truth or falsity of the disclosure and, therefore, was not entitled to protection of the Act under K.S.A. 1994 Supp. 75-2973(c)(4)(C).

We then also affirmed summary judgment as to Crandon's common-law whistleblower claim (and apparently an asserted free speech retaliatory discharge claim she added later to her complaint), stating briefly: "For the reasons stated in sections II [re-

garding the relevance of her status as in-house counsel and the model rules of professional conduct to her free speech claim] and III [analysis of her statutory whistle-blower claim], plaintiff's common-law claims cannot be sustained." 257 Kan. at 744.

Prager asserts in his brief that by taking the above approach in *Crandon*, we "apparently recognized that Civil Service employees . . . can pursue both statutory whistle-blower claims and common law whistle-blower claims." However, *Crandon* never discussed the exclusive remedy issue. The court merely found summarily that the common-law whistleblower claim could not be sustained on its merits. Though it is clear that this common-law public policy protection can apply to public employees, see *Larson v. Ruskowitz*, 252 Kan. 963, 968, 850 P.2d 253 (1993), and although common-law whistleblower claims have been raised by public employees of various sorts in several Kansas cases, see, *e.g., Wiggins v. Housing Authority of Kansas City*, 19 Kan. App. 2d 610, 873 P.2d 1377, *rev. denied* 255 Kan. 1007 (1994); *Dennis,* 19 Kan. App. 2d 515, none of these cases had occasion to discuss state civil service employees and the impact that K.S.A. 75-2973 has on the availability of a common-law action for those public employees who are covered by K.S.A. 75-2973.

Because of the uncertainty, we issued a show cause order in which we asked:

"Why appellant's appeal as to his issue raising a common law 'whistleblowing' claim for relief should not be dismissed under the alternative remedies doctrine because K.S.A. 75-2973 provides a classified civil service employee an adequate alternative remedy and thereby precludes the common-law remedy, or in the alternative,

"Why appellant's appeal as to his issue raising a common-law 'whistleblowing' claim for relief should not be dismissed for failure to exhaust his administrative remedies available and as established by K.S.A. 75-2973 and the Kansas Civil Service Act. See, *e.g., Pecenka v. Alquest,* 232 Kan. 97, 652 P.2d 679 (1982)."

Because our ruling is determinative of this issue, we first discuss the alternative remedies doctrine application to Prager's attempt to pursue both a statutory and a common-law claim of retaliatory discharge based on whistleblowing.

As explained in *Flenker v. Willamette Industries, Inc.*, 266 Kan. 198, 202-03, 967 P.2d 295 (1998):

"The alternative remedies doctrine at issue here, referenced sometimes as preclusion, is a substitution of law concept. Under the alternative remedies doctrine, a state and federal statute would be substituted for a state retaliation claim if the substituted statute provides an adequate remedy. *Bair v. Peck*, 248 Kan. 824, 838, 811 P.2d 1176 (1991)."

Our reference to *Bair v. Peck* was to the statement therein that "[i]t has long been recognized that no one has a vested right in common-law rules governing negligence actions which would preclude substituting a viable statutory remedy for one available at common law. [Citation omitted.]" 248 Kan. at 838-89.

We must then focus on the question asked in *Flenker*, which is "whether the statutory remedy is adequate and thus precludes the common-law remedy." 266 Kan. at 203.

Flenker involved a certified question: whether the remedy provided by § 11(c) (29 U.S.C. § 660(c) [1994]) of the Occupational Safety and Health Act (OSHA) for employees who allege they have been discharged in retaliation for filing complaints under that statute precludes the filing of a Kansas common-law wrongful discharge claim under Kansas' public policy exception to employment-at-will.

We ultimately determined that OSHA did not provide an employee an adequate remedy, with our significant finding being that the employee's only OSHA remedy consisted of the right to file a complaint with the Secretary of Labor who then had the sole discretion to bring an action on the employee's behalf. The employee had no appeal rights if the Secretary declined to file the suit. We found this lack of control in the employee and the absolute discretion of the Secretary was "a significant limitation of the employee's right of redress." 266 Kan. at 206. We also noted that the Secretary's discretion could be affected by budgetary constraints and political pressure.

Our *Flenker* opinion noted that under the OSHA statute, an employee only had 30 days from the date of the violation to file a complaint under the act. This short time frame is consistent with K.S.A. 75-2973(d), which requires a complaint to be filed by an

employee within 30 days of the violation. This was not deemed by us to be the most critical factor in *Flenker* for, as we have previously stated, the lack of control in the employee was the most significant factor. *Flenker* is clearly distinguishable from our case because here, Prager is in control of his statutory claim, while under the OSHA statute, the employee has no such right.

The ultimate question for us is whether K.S.A. 75-2973 provides Prager with an adequate remedy.

K.S.A. 75-2973(d) provides that a classified employee such as Prager, who alleges he was disciplined in violation of the statute, has the right to appeal to the Kansas Civil Service Board. The Kansas Legislature has provided extensive procedures under KAPA to employees such as Prager, which include representation by counsel, filing of pleadings, issuing of subpoenas, discovery, presentation of evidence and arguments in a hearing, reconsideration, and ultimately filing appeals. See K.S.A. 77-501 *et seq.*

If the Board finds the disciplinary action was unreasonably taken, K.S.A. 75-2973(d) requires the Board to "modify or reverse the agency's action and order such relief for the employee as the [B]oard considers appropriate." In addition, the Board may discipline the violator.

Also weighing in favor of limiting classified civil service employees to the remedies provided by K.S.A. 75-2973(d) is the legislative attempt to balance the various competing interests of the State to encourage whistleblowing while still preventing disruptions of the normal agency disciplinary processes. The legislation appears to be crafted to cover the type of situation we are presented with.

We recognize that the legislature did not expressly make this remedy exclusive, which weighs against such a finding. *Cf. Van Scoyk v. St. Mary's Assumption Parochial School,* 224 Kan. 304, 305-06, 580 P.2d 1315 (1978). Prager also argues that a finding of exclusiveness would be contrary to *Parker v. Kansas Neurological Institute,* 13 Kan. App. 2d 685, 687-689, 778 P.2d 390, *rev. denied* 245 Kan. 785 (1989). Parker involved a claim of racial discrimination and differs from our case where a specific legislative statute was crafted to cover a specific factual situation.

State employment comes with benefits, but it is also necessary for the general public good that employees accept limitations that insure a workable system. We hold that K.S.A. 75-2973 provides a classified civil service employee an adequate remedy for claimed whistleblowing activities, and the dismissal of Prager's purported common-law whistleblowing claim is affirmed, although not for the reasons utilized by the trial court.

Because of this ruling it is not necessary nor will we comment on the exhaustion question raised by our show cause order.

*Summary*

We hold:

The trial court erroneously dismissed the plaintiff's 42 U.S.C. § 1983 action for injunctive relief against the Kansas Department of Revenue and its Secretary in her official capacity for failure to exhaust administrative remedies, and its ruling doing so is reversed, however, the trial court did correctly dismiss the plaintiff's 42 U.S.C. § 1983 action for injunctive relief against the Kansas Department of Revenue, although not for the reasons it relied on, and its ruling doing so is affirmed.

The trial court erroneously dismissed the plaintiff's 42 U.S.C. § 1983 action for injunctive relief seeking reinstatement of employment against the Secretary of the Kansas Department of Revenue in her official capacity, and its ruling doing so is reversed.

The trial court correctly dismissed plaintiff's claim for damages pursuant to the Kansas Tort Claims Act against the Kansas Department of Revenue and its former Secretary in his personal capacity for claimed deprivation of plaintiff's United States and Kansas constitutional rights of free speech, and its ruling doing so is affirmed.

The trial court correctly dismissed plaintiff's claim for damages pursuant to the Kansas Tort Claims Act against the Kansas Department of Revenue and its former Secretary in his personal capacity for claimed deprivation of plaintiff's United States and Kansas constitutional rights of due process, and its ruling doing so is affirmed.

The trial court erroneously dismissed plaintiff's claim for damages under the Kansas Civil Service Act against the Kansas Department of Revenue for claimed deprivation of his United States and Kansas constitutional rights of due process to a prompt post-termination administrative hearing because the record is not sufficiently developed at this time to justify dismissal, and its ruling in doing so is reversed.

The trial court correctly dismissed the former Secretary of the Kansas Department of Revenue from plaintiff's claim under the Kansas Civil Service Act for claimed deprivation of United States and Kansas constitutional rights of due process, and its ruling doing so is affirmed.

The trial court correctly dismissed plaintiff's claim of common-law whistleblowing against the Kansas Department of Revenue and its former Secretary in his personal capacity for retaliatory discharge because K.S.A. 75-2973 provides a Kansas classified civil service employee an adequate alternative statutory remedy for whistleblowing, and the trial court's ruling in dismissing this claim is affirmed although not for the reason utilized by the trial court.

SIX and ABBOTT, JJ., not participating.
STEVE LEBEN, District Judge, assigned.
JOHN WECKEL, Senior Judge, assigned.